ORIGINAL

AO 91 (Rev. 11/82) | **CRIMINAL COMPLAINT** | FILED
CLERK, U.S. DISTRICT COURT
JUL 22 2019
CENTRAL DISTRICT OF CALIFORNIA
BY _____ DEPUTY

| UNITED STATES DISTRICT COURT | CENTRAL DISTRICT OF CALIFORNIA |
|---|---|
| UNITED STATES OF AMERICA<br>v.<br>LUIS ALBERTO LOPEZ-MEDINA and VICENTE SANCHEZ-SANCHEZ | DOCKET NO.<br><br>MAGISTRATE'S CASE NO.<br>**19 MJ02988** |

Complaint for violation of Title 21, United States Code, Section 841(a)(1)

| NAME OF MAGISTRATE JUDGE<br>THE HONORABLE ~~ALICIA G. ROSENBERG~~ ROZELLA A. OLIVER | UNITED STATES MAGISTRATE JUDGE | LOCATION<br>Los Angeles, California |
|---|---|---|

| DATE OF OFFENSE<br>July 20, 2019 | PLACE OF OFFENSE<br>Los Angeles County | ADDRESS OF ACCUSED (IF KNOWN) |
|---|---|---|

COMPLAINANT'S STATEMENT OF FACTS CONSTITUTING THE OFFENSE OR VIOLATION:

[21 U.S.C. § 841(a)(1)]

On or about July 20, 2019, in Los Angeles County, within the Central District of California, defendants LUIS ALBERTO LOPEZ-MEDINA and VICENTE SANCHEZ-SANCHEZ knowingly possessed with intent to distribute a controlled substance.

BASIS OF COMPLAINANT'S CHARGE AGAINST THE ACCUSED:

(See attached affidavit which is incorporated as part of this Complaint)

MATERIAL WITNESSES IN RELATION TO THIS CHARGE: N/A

| Being duly sworn, I declare that the foregoing is true and correct to the best of my knowledge. | SIGNATURE OF COMPLAINANT<br>**MICHAEL GARLAND** /s/ Michael Garland |
|---|---|
| | OFFICIAL TITLE<br>Special Agent, Homeland Security Investigations |

Sworn to before me and subscribed in my presence,

| SIGNATURE OF MAGISTRATE JUDGE(1) | DATE<br>07-22-2019 |
|---|---|

(1) See Federal Rules of Criminal Procedure 3 and 54

AUSA Sylvia R. Ewald 213-894-0717        REC: Detention

## AFFIDAVIT

I, Michael Garland, being duly sworn, declare and state as follows:

### I.   PURPOSE OF AFFIDAVIT

1. This affidavit is made in support of a criminal complaint against Luis Alberto LOPEZ-Medina ("LOPEZ") and Vicente SANCHEZ-Sanchez ("SANCHEZ") for a violation of 21 U.S.C. § 841(a)(1): Possession with Intent to Distribute a Controlled Substance.

1. This affidavit is also made in support of an application for a warrant to search the following four digital devices (collectively, the "SUBJECT DEVICES"), in the custody of Homeland Security Investigations, in Los Angeles, California, as described more fully below and in Attachment A:

    a.   Black cell phone ("SUBJECT DEVICE 1");

    b.   Black cell phone, serial number 320376257887 ("SUBJECT DEVICE 2");

    c.   Gray GPS Garmin GPSmap 78SC ("SUBJECT DEVICE 3"); and

    d.   Silver Samsung cell phone, serial number SM-JZ60T1 ("SUBJECT DEVICE 4").

2. The requested search warrant seeks authorization to seize evidence, fruits, or instrumentalities of violations of 21 U.S.C. § 841(a)(1) (Distribution and Possession with Intent to Distribute Controlled Substances), 21 U.S.C. § 846 (Conspiracy and Attempt to Distribute and Possess with Intent to Distribute Controlled Substances), and 21 U.S.C. § 952 (Importation of

Controlled Substances) (the "Subject Offenses"), as described more fully in Attachment B. Attachments A and B are incorporated herein by reference.

3. The facts set forth in this affidavit are based upon my personal observations, my training and experience, and information obtained from various law enforcement personnel and witnesses. This affidavit is intended to show merely that there is sufficient probable cause for the requested complaint and search warrant, and does not purport to set forth all of my knowledge of or investigation into this matter. Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only.

## II. **BACKGROUND OF AFFIANT**

4. I am a Special Agent ("SA") with the United States Department of Homeland Security ("DHS"), Immigration and Customs Enforcement ("ICE"), Homeland Security Investigations ("HSI"), assigned to the Special Agent in Charge Los Angeles, California field office ("HSI Los Angeles"). I have been so employed since September 2015. I am currently assigned to the HSI Los Angeles Border Enforcement Security Taskforce ("LA BEST"), where I investigate criminal violations relating to human trafficking and smuggling. I have received training in human smuggling and human trafficking investigations. I have also successfully completed the Criminal Investigator Training Program and the ICE/HSI Special Agent Training Program at the Federal Law Enforcement Training Center, where I learned about, and was

evaluated on, various investigative techniques and subjects, including computer crimes and child pornography crimes, human trafficking and smuggling, intellectual property rights, and the importation of narcotics. I have also participated in the execution of numerous search warrants, many of which involved human trafficking and drug smuggling offenses.

### III. **SUMMARY OF PROBABLE CAUSE**

5. On July 20, 2019, at about 4:15 PM, Los Angeles Port Police ("LAPP") saw a boat at the Cabrillo Beach Boat Ramp in San Pedro, California, and a truck with a boat trailer driven by Bernardo Hernandez ("Hernandez"). LAPP saw that the bow of the boat was low in the water, the men who had been on the boat (LOPEZ and SANCHEZ) had difficulty loading the boat onto a trailer, and the California Vessel Registration Number displayed on the boat came back to a different make and model. After the boat was loaded onto Hernandez's trailer, LOPEZ, SANCHEZ, and Hernandez all denied ownership of the boat and Hernandez gave LAPP consent to board and search the boat. LAPP saw that the cabin of the boat contained approximately 50 large black garbage bags, weighing approximately 1,152 pounds. LAPP opened 11 bags and saw they contained bales of suspected marijuana; samples from those 11 bags also field-tested positive for marijuana. In post-Miranda interviews, LOPEZ and SANCHEZ admitted to transporting drugs. Law enforcement found SUBJECT DEVICE 1 in Hernandez's truck, SUBJECT DEVICE 2 on SANCHEZ's person, and SUBJECT DEVICES 3 and 4 in a satchel on the boat.

3

## IV. STATEMENT OF PROBABLE CAUSE

6. Based on my review of law enforcement reports, conversations with other law enforcement agents, and my own knowledge of the investigation, I am aware of the following:

### A. Officers See Empty Boat Trailer and Boat Approaching Launch Ramp

7. On July 20, 2019, at about 4:15 PM, LAPP officers were conducting patrol in and around the Cabrillo Beach Boat Ramp, 3720 Stephen M. White Drive, San Pedro, CA 90731.

8. LAPP Sergeant Logan Braun noticed a truck drive into the boat ramp area pulling an empty boat trailer. The driver of this truck was later identified as Hernandez. Based on Sergeant Braun's training and experience, this was unusual, as common practice when a boat is launched from a specific boat ramp is for the vehicle with the empty trailer to be parked at the ramp while the vessel is out on the water.

9. After about ten minutes, a boat arrived at the ramp and the truck and trailer backed up to load the vessel. Sergeant Braun noticed that the bow of the boat was sitting unusually low in the water, suggesting an abnormally heavy load. The operators of the boat, later identified as LOPEZ and SANCHEZ, had difficulty maneuvering the boat onto the boat trailer. Based on Sergeant Braun's training and experience, this is indicative of poor seamanship skills and an unfamiliarity with the vessel.

10. Sergeant Braun observed that the California Vessel Registration Number ("CF") displayed on the vessel was CF1627JU.

4

A records check of the CF number showed that the number is registered to a different make and model of boat. Additionally, a records check of the Hull Identification Number on the boat revealed that the proper CF number for this vessel is CF1627JV, not CF1627JU. Based on Sergeant Braun's training and experience, maritime smugglers often alter or change their vessel CF numbers, believing it helps them avoid detection. Furthermore, the CF number CF1627JU was not registered to LOPEZ, SANCHEZ, or Hernandez. Based on Sergeant Braun's training and experience, following the purchase of a vessel intended for smuggling, smugglers often either fail to register it in their name or register it to a fictional third party to avoid being affiliated with the vessel's illegal activity.

### B.  Officers Find Drugs on the Boat

11. Based upon conversations with Sergeant Braun, I understand that Sergeant Braun approached the boat while the boat was on the trailer, the trailer was still in the water, and Hernandez was trying to get the boat out of the water. No one was on the boat at this point in time. Sergeant Braun asked in English who the boat belonged to, and Hernandez, LOPEZ, and SANCHEZ all denied that the boat was theirs. Sergeant Braun then asked if it was okay for him to go ahead and search the boat. In English, Hernandez told Sergeant Braun he could go ahead and search the boat.

12. The cabin was closed when Sergeant Braun boarded the boat. Because the registration information for the boat did not match the make and model of the boat, Sergeant Braun looked for

5

registration information on board. Sergeant Braun opened a small door to the cabin, and immediately smelled marijuana. He then opened a larger door to the cabin and saw the garbage bags in the cabin.

13. Sergeant Braun saw large black trash bags piled up high in the cabin. Based on Sergeant Braun's training and experience, smugglers often place their drugs in plastic bags to protect their drugs from water and moisture. Smugglers also often put as large a quantity of drugs onto a boat as the boat can hold, many times causing too much weight in one place on the boat.

14. Customs and Border Patrol ("CBP") Officers Christopher Griffith and William Villarreal then arrived and asked the truck driver and boat occupants some initial questions to establish the subjects' citizenship and nexus to the U.S. border. Based on conversations with Officers Griffith and Villareal, I know that Hernandez told the officers he is a U.S. citizen, LOPEZ and SANCHEZ told the officers they are citizens of Mexico, and SANCHEZ added that he and LOPEZ had arrived from Mexico on the boat. The boat, truck, and Hernandez, LOPEZ, and SANCHEZ were searched under U.S. Customs & Border Projection Border Search Authority pursuant to Title 19, Code of Federal Regulations, § 162.6.

15. Based upon conversations with Officers Griffith and Villareal, I know that a cell phone was recovered from the truck Hernandez was driving, still plugged into the vehicle charger (SUBJECT DEVICE 1). Additionally, SANCHEZ had a cell phone on

his person (SUBJECT DEVICE 2). On the boat, CBP found a satchel, which contained a handheld GPS (SUBJECT DEVICE 3) and a phone (SUBJECT DEVICE 4).

16. Officers Griffith and Villareal unloaded the large black plastic bags from the boat. In all, there were approximately 50 bags. Eleven bags were opened and found to contain bails of a green leafy substance with the odor of marijuana. Those eleven bails also field-tested positive for the properties of marijuana. The weight of the suspected marijuana is approximately 1,152 pounds, including the black plastic bags.

    C.    **Hernandez's Statements**

17. On July 20, 2019, Hernandez gave a Mirandized interview at the CBP facility at 321 Windsor Way, Long Beach, CA 90802. Based upon my conversations with Special Agent Travis Donaldson and Task Force Officer Diane Kelley, who conducted the interview, I know the following:

    a.    Hernandez stated that he was approached by a man named "Ivan," whom he knows from living in the projects, at his home in Los Angeles, California. HERNANDEZ stated that Ivan is an Eighth Street gang member who goes by the street name "Biggs." Ivan told HERNANDEZ that Ivan would pay $1,000 if HERNANDEZ would pick up a truck and trailer, travel to Cabrillo Beach, and pull out a boat with some "fishermen" on board. HERNANDEZ stated the truck was left for him on the corner of Whittier Boulevard and Mott Street, with the trailer already

attached and the keys in the glove box. HERNANDEZ believed the truck belongs to Ivan.

      b. HERNANDEZ stated that he picked up the truck and trailer and drove to Cabrillo Beach. HERNANDEZ said he arrived at Cabrillo Beach at approximately 8:00 AM on July 20, 2019. HERNANDEZ said he saw law enforcement in the parking lot and advised Ivan of this. HERNANDEZ waited at the launch ramp until receiving a text message from Ivan that the boat had arrived on the cell phone HERNANDEZ had with him in the truck. HERNANDEZ said this phone belongs to Ivan. HERNANDEZ also said that he used the provided phone to text the mother of his children.

      c. After receiving the message from Ivan that the boat had arrived, HERNANDEZ stated that the men on the boat waved to him, so he knew it was the correct boat. HERNANDEZ backed the trailer into the water. HERNANDEZ stated that the boat pulled onto the trailer, but was loaded incorrectly. HERNANDEZ said that at this time law enforcement approached him and he and the occupants of the boat were detained.

  D. **LOPEZ's Statements**

  18. On July 20, 2019, LOPEZ was Mirandized in Spanish and gave an interview at the CBP facility at 321 Windsor Way, Long Beach, CA 90802. Based upon my conversations with Task Force Officer Bobby Kennedy, Special Agent Travis Donaldson, and CBP Officer William Villarreal, who conducted the interview in Spanish, I know the following:

      a. LOPEZ said he is a mechanic for some boats but mostly vehicles. He is from Sinaloa, Mexico, but has been

living in Tijuana, Mexico for the past four years. LOPEZ has known SANCHEZ for approximately 15 years, from living in the same area. LOPEZ's father is a fisherman and taught LOPEZ about boats and fishing.

   b. LOPEZ said that while he was in Tijuana, he was contacted by a man named "Guero," who he described as a thin light-skinned Hispanic male in his late twenties. Guero wanted to know if LOPEZ needed work. LOPEZ told him yes. LOPEZ was told he could have a job transporting items via boat and would be paid $6,000. Guero told LOPEZ he would receive five days' notice before a trip. LOPEZ thought this was easy money. Guero later contacted LOPEZ about a trip and made arrangements for LOPEZ to fly to Ensenada, Mexico.

   c. LOPEZ said that both he and SANCHEZ flew to Ensenada. When they arrived, a driver picked them up from the airport and took them to an apartment. During dinner, members of a drug trafficking organization came to visit. They asked LOPEZ if he was scared to do the job and mentioned he would be transporting marijuana. LOPEZ said he was now wishing he did not take the job, but that he felt it was too late. LOPEZ and SANCHEZ were told they would be picked up the next evening to be taken to the boat.

   d. At approximately 6:00 PM, on July 19, 2019, LOPEZ and SANCHEZ were picked up and driven to a marina in Ensenada where a boat was docked. As LOPEZ made his way to the boat, he was given a GPS and phone. A man who went by the name "El Gordo" told LOPEZ that the GPS was programmed to Cabrillo Beach

and gave LOPEZ and SANCHEZ instructions. El Gordo told LOPEZ he would call them and check their location. Once they were near the destination, El Gordo would send a truck and trailer. Once LOPEZ and SANCHEZ arrived at the location, they were to dock the boat and walk away and a car would pick them up nearby. El Gordo told LOPEZ a car would come pick them up nearby. The truck and trailer was then supposed to take the boat out of the water and drive off. LOPEZ and SANCHEZ were instructed to drive the boat 50 miles out until they crossed into the United States, then slowly make their way closer to the coast.

e. When LOPEZ made his way down to the boat, he noticed it was bow-heavy. He could smell the marijuana and became uneasy. He told the men at the dock the boat was not safe and he did not want to go. They argued at the dock, and LOPEZ was pressured and felt he had to go or something might happen to him.

f. LOPEZ and SANCHEZ set off. LOPEZ said the boat was way too heavy and it was an unsafe ride up the coast. The engine shut off repeatedly, and LOPEZ was scared they were not going to make it. Once they were close to Cabrillo Beach, LOPEZ received a call from El Gordo. LOPEZ was told the truck and trailer were waiting nearby and he would give the truck driver a call to start moving. Once LOPEZ and SANCHEZ arrived and docked the boat, the driver who was supposed to take the boat wanted LOPEZ and SANCHEZ to load the boat on the trailer. LOPEZ and the driver, Hernandez, began to argue because that was not the plan. LOPEZ and SANCHEZ have never seen or met Hernandez

before.  LOPEZ and SANCHEZ helped put the boat on the trailer, when police officers arrived on scene.

    **E.**    **Vicente SANCHEZ-Sanchez's Statements**

    19.  On July 20, 2019, SANCHEZ was Mirandized in Spanish and gave an interview at the CBP facility at 321 Windsor Way, Long Beach, CA 90802.  Based upon my conversations with Task Force Officer Diane Kelley and CBP Officer William Villarreal, who conducted the interview in Spanish, I know the following:

        a.  SANCHEZ said he is a fisherman from Sinaloa, Mexico.  SANCHEZ is acquainted with a man known as "El Gordo," whom he described as an overweight male Hispanic approximately 5'8" tall, in his thirties, with a dark complexion and black hair.  SANCHEZ said El Gordo called SANCHEZ at his home and asked SANCHEZ to drive a boat from Ensenada, Mexico to California.  SANCHEZ suspected he was going to be transporting marijuana.  SANCHEZ was offered to split approximately $18,000 USD between himself and LOPEZ.  SANCHEZ was told he would receive the payment once the job was completed and he had returned to Mexico.  SANCHEZ said times are rough and he needed the money to support his family, so he agreed to take the job.  This was the first time SANCHEZ smuggled narcotics into the United States.  SANCHEZ said he has worked for El Gordo one other time in Mexico, transporting marijuana locally on a small skiff.

        b.  SANCHEZ said that the drug trafficking organization bought airline tickets from Sinaloa to Ensenada for SANCHEZ and LOPEZ.  SANCHEZ stated he knows LOPEZ from living in

11

Sinaloa. Both flew to Ensenada on Thursday, July 18, 2019. They arrived at the airport at approximately 1:00 PM, and a taxi picked them up and brought them to an apartment in Ensenada. While at the apartment, members from the drug trafficking organization came by to see SANCHEZ and LOPEZ and told them they would be leaving the next evening. SANCHEZ and LOPEZ slept at the apartment for the night. The next day around 6:00 PM, SANCHEZ and LOPEZ were picked up and driven to a marina in Ensenada. The boat was already docked and loaded when they arrived. LOPEZ was given a phone and GPS. The coordinates were already programmed in the GPS. SANCHEZ and LOPEZ got on the boat and set off.

        c. SANCHEZ was told that once he and LOPEZ were in the area of Cabrillo Beach, someone would call the phone LOPEZ had or LOPEZ would make a call to someone. Once the call was either made or received, the boat was supposed to be loaded onto a trailer. SANCHEZ was not sure how he and LOPEZ were supposed to get back to Mexico. SANCHEZ assumed the person taking the boat out of the water would give them a ride out of the area.

## V. TRAINING AND EXPERIENCE ON DRUG OFFENSES

20. Based on my training and experience and familiarity with investigations into drug trafficking conducted by other law enforcement agents, I know the following:

        a. Drug smuggling is a business that involves numerous co-conspirators, from lower-level dealers to higher-level suppliers, as well as associates to process, package, and deliver the drugs and launder the drug proceeds. Drug smugglers

often use recreational vessels, in connection with their illegal activities in order to avoid detection, meet with co-conspirators, conduct drug transactions, and transport drugs or drug proceeds.

      b.    Every person or conveyance entering the United States is required to present himself or herself to a U.S. Customs & Border Protection Officer for inspection prior to entering the United States. Smugglers fail to report for inspection and even adjust their methods and routes to avoid law enforcement and detection. Evidence of smugglers' routes, instructions about routes from co-conspirators, and the actual routes taken are often found in digital devices such as GPS devices and cellular telephones in their possession.

      c.    Drug traffickers often maintain books, receipts, notes, ledgers, bank records, and other records relating to the manufacture, transportation, ordering, sale and distribution of illegal drugs. The aforementioned records are often maintained where the drug trafficker has ready access to them, such as on their cell phones and other digital devices.

      d.    Communications between people smuggling contraband into the United States take place by telephone calls and messages, such as e-mail, text messages, and social media messaging applications, sent to and from cell phones and other digital devices. This includes coordinating routes, landing locations, shore side lookouts and scouts, and pick-up crews and vehicles. In addition, it is common for people engaged in drug smuggling to have photos and videos on their cell phones of

drugs they or others working with them possess, as they frequently send these photos to each other and others to boast or provide updates about the drugs or facilitate drug sales.

       e.    Drug smugglers often keep the names, addresses, and telephone numbers of their drug smuggling associates on their digital devices. Drug smugglers often keep records of meetings with associates, customers, and suppliers on their digital devices, including in the form of calendar entries and location data.

## VI. TRAINING AND EXPERIENCE ON DIGITAL DEVICES

21.    As used herein, the term "digital device" includes the SUBJECT DEVICES.

22.    Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that the following electronic evidence, inter alia, is often retrievable from digital devices:

       a.    Forensic methods may uncover electronic files or remnants of such files months or even years after the files have been downloaded, deleted, or viewed via the Internet. Normally, when a person deletes a file on a computer, the data contained in the file does not disappear; rather, the data remain on the hard drive until overwritten by new data, which may only occur after a long period of time. Similarly, files viewed on the Internet are often automatically downloaded into a temporary directory or cache that are only overwritten as they are replaced with more recently downloaded or viewed content and may also be recoverable months or years later.

b.  Digital devices often contain electronic evidence related to a crime, the device's user, or the existence of evidence in other locations, such as, how the device has been used, what it has been used for, who has used it, and who has been responsible for creating or maintaining records, documents, programs, applications, and materials on the device.  That evidence is often stored in logs and other artifacts that are not kept in places where the user stores files, and in places where the user may be unaware of them.  For example, recoverable data can include evidence of deleted or edited files; recently used tasks and processes; online nicknames and passwords in the form of configuration data stored by browser, e-mail, and chat programs; attachment of other devices; times the device was in use; and file creation dates and sequence.

c.  The absence of data on a digital device may be evidence of how the device was used, what it was used for, and who used it.  For example, showing the absence of certain software on a device may be necessary to rebut a claim that the device was being controlled remotely by such software.

d.  Digital device users can also attempt to conceal data by using encryption, steganography, or by using misleading filenames and extensions.  Digital devices may also contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed.  Law enforcement continuously develops and acquires new methods of decryption, even for devices or data that cannot currently be decrypted.

15

23. Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that it is not always possible to search devices for data during a short period of time for a number of reasons, including the following:

    a. Digital data are particularly vulnerable to inadvertent or intentional modification or destruction. Thus, often a controlled environment with specially trained personnel may be necessary to maintain the integrity of and to conduct a complete and accurate analysis of data on digital devices, which may take substantial time, particularly as to the categories of electronic evidence referenced above.

    b. Digital devices capable of storing multiple gigabytes are now commonplace. As an example of the amount of data this equates to, one gigabyte can store close to 19,000 average file size (300kb) Word documents, or 614 photos with an average size of 1.5MB.

24. The search warrant requests authorization to use the biometric unlock features of a device, based on the following, which I know from my training, experience, and review of publicly available materials:

    a. Users may enable a biometric unlock function on some digital devices. To use this function, a user generally displays a physical feature, such as a fingerprint, face, or eye, and the device will automatically unlock if that physical feature matches one the user has stored on the device. To unlock a device enabled with a fingerprint unlock function, a

16

user places one or more of the user's fingers on a device's fingerprint scanner for approximately one second. To unlock a device enabled with a facial, retina, or iris recognition function, the user holds the device in front of the user's face with the user's eyes open for approximately one second.

      b. In some circumstances, a biometric unlock function will not unlock a device even if enabled, such as when a device has been restarted or inactive, has not been unlocked for a certain period of time (often 48 hours or less), or after a certain number of unsuccessful unlock attempts. Thus, the opportunity to use a biometric unlock function even on an enabled device may exist for only a short time. I do not know the passcodes of the devices likely to be found in the search.

      c. The person who is in possession of a device or has the device among his or her belongings is likely a user of the device. Thus, the warrant I am applying for would permit law enforcement personnel to, with respect to any device that appears to have a biometric sensor and falls within the scope of the warrant: (1) depress Hernandez's, LOPEZ's, and/or SANCHEZ's thumb- and/or fingers on the device(s); and (2) hold the device(s) in front of Hernandez's, LOPEZ's, and/or SANCHEZ's face with their eyes open to activate the facial-, iris-, and/or retina-recognition feature.

  25. Other than what has been described herein, to my knowledge, the United States has not attempted to obtain this data by other means.

17

## VII. CONCLUSION

26. For all of the reasons described above, there is probable cause to believe that Luis Alberto LOPEZ-Medina and Vicente SANCHEZ-Sanchez have committed a violation of 21 U.S.C. § 841(a)(1): Possession with Intent to Distribute a Controlled Substance. There is also probable cause that the items to be seized described in Attachment B will be found in a search of the SUBJECT DEVICES described in Attachment A

_____
Michael Garland, Special Agent
Homeland Security
Investigations

Subscribed to and sworn before me this 22ND day of July, 2019.

_____
UNITED STATES MAGISTRATE JUDGE